290 S.E.2d 22

**Irvin BLACKBURN**

v.

**STATE of West Virginia.**

No. 14497.

Supreme Court of Appeals of
West Virginia.

March 30, 1982.

**98**

Ward & Cline, John L. Ward and Michael R. Cline, Charleston, Willard D. Lorensen, Morgantown, for plaintiff.

Chauncey H. Browning, Atty. Gen., Victor A. Barone, Deputy Atty. Gen. and Silas B. Taylor, Asst. Atty. Gen., Charleston, for defendant.

McGRAW, Justice:

The appellant, Irvin Blackburn, appeals from an order entered July 21, 1978, by the Circuit Court of Boone County following a habeas corpus proceeding. The circuit court resentenced the appellant on the basis of criminal convictions obtained against him in May and October of 1975. The appellant challenges his conviction by jury verdict on the charge of accessory before the fact to the crime of arson on the grounds that the trial court erroneously allowed the introduction, over objection, of evidence of collateral crimes and of a tape recorded telephone conversation between the appellant and an informant for the State. The appellant also alleges defects in his conviction by guilty plea on the charges of accessory before the fact to the crime of malicious wounding. We find no error and we affirm the conviction.

The appellant was indicted by the Grand Jury of Boone County in January 1975 on three separate charges: Indictment No. 920 charged him with two counts of being an accessory before the fact to the crime of malicious wounding which occurred in Prince William County, Virginia; Indictment No. 921 charged him with one count of being an accessory before the fact to the crime of attempted murder which occurred in Prince William County, Virginia; Indictment No. 922 charged him with one count of being an accessory before the fact to the crime of first degree arson which was committed in Boone County. These charges arose out of a series of assaults committed upon one Camerson McCallister, a resident of Manassas, Virginia, and the burning of the home of Charles McCallister, father of Camerson McCallister and a resident of Boone County.

The appellant was tried on the arson charge on May 27–30, 1975. He was found guilty by a jury and was sentenced to a term of imprisonment in the state penitentiary of not less than 2 nor more than 20 years. On July 3, 1975, the appellant filed a motion to set aside the verdict and to grant a new trial on the grounds that (1) the trial court erred in admitting, over objection, evidence of collateral crimes, (2) the trial court erred in admitting, over objection, a tape recorded telephone conversation between the appellant and a police informant, (3) the trial court erred in denying the appellant's motion for a mistrial upon the admission of this evidence, and (4) the verdict was contrary to the law and the evidence. The circuit court denied this motion, and on July 25, 1975, the appellant filed an amended notice of intent to appeal the conviction upon the same grounds alleged in the motion to set aside the verdict. On September 18, 1975, the trial court entered an order granting a stay of execution

for 60 days in order to permit the appellant to perfect his appeal.

On October 27, 1975, trial began on the charges of malicious wounding. Before the case was submitted to the jury, however, the appellant entered into a plea bargain agreement with the prosecution. Under the terms of the agreement, which was accepted by the trial court on October 29, 1975, the appellant agreed to plead guilty to the malicious wounding charges and to withdraw his pending appeal from his conviction of the arson charge. The prosecution in turn agreed to *nolle* the indictment charging the appellant with being an accessory before the fact to the crime of attempted murder. On November 5, 1975, the circuit court entered an order of conviction on the malicious wounding charges and sentenced the appellant to imprisonment for a term of not less than 2 nor more than 10 years.

On January 16, 1976, the appellant filed a petition for a writ of habeas corpus with this Court on several of the grounds raised in this appeal. The appellant requested discharge from all criminal liability on the malicious wounding charges and a new trial on the arson charge. On February 9, 1976, this Court issued a rule to show cause, returnable March 1, 1976, before the Circuit Court of Boone County. On March 5, 1976, after a full hearing, that court entered a memorandum opinion and order resolving all issues raised by the appellant in favor of the State and denying habeas corpus relief. The appellant requested a transcript of the proceedings for purposes of appeal and was resentenced on both convictions. On October 29, 1976, the appellant filed with this Court a petition for an appeal from the circuit court's order, alleging that the lower court erred in its findings and conclusions. On November 15, 1976, this Court refused the writ of error prayed for.

On October 12, 1977, the appellant filed with this Court a *pro se* application for a writ of habeas corpus on the ground that the circuit court had failed to provide him with a transcript of the proceedings of his convictions upon which to file for post-conviction relief. This Court refused to grant the petition on November 14, 1977. On November 30, 1977, the appellant filed a second *pro se* application for a writ of habeas corpus on the same ground. A rule to show cause, returnable January 5, 1978, before the Circuit Court of Boone County, was issued "on arson indictment and record only." By order entered January 27, 1978, the circuit court ordered a transcript of the proceedings printed and appointed counsel to represent the appellant for the purpose of appealing his conviction on the arson charge. On April 5, 1978, the transcript was transcribed and printed. On July 24, 1978, the circuit court issued an order directing the warden of the penitentiary to produce the appellant in court on July 19, 1978, for proceedings on the appellant's petition for habeas corpus relief. On July 21, 1978, the circuit court entered an order resentencing the appellant on both charges and denying his request for a stay of execution. On August 4, 1978, the appellant filed a notice of intent to appeal the court's judgment. After receiving from this Court an extension of time within which to prepare an appeal, the appellant filed a petition for a writ of error on April 12, 1979.

Initially we note that although this action is styled by the parties as an appeal from a denial of habeas corpus relief, it is more properly a direct appeal from the appellant's original conviction on the arson charge. The petition for habeas corpus which instigated these proceedings was grounded solely on the failure of the trial court to provide the appellant with a transcript of the criminal proceedings against him. There is no pleading, petition or other document in the record accompanying this appeal which raises the substantive claims put forth by the appellant here. Nor do we have before us a record of the habeas corpus proceedings conducted by the circuit court on July 19, 1978. All the record shows is that the appellant requested habeas corpus relief on the ground that he had not been provided with a transcript upon which to seek post-conviction relief, that the circuit court ordered a transcript to be made and that the appellant was subsequently denied habeas corpus relief and

resentenced. In the absence of anything in the record to the contrary, we must assume that the appellant was resentenced in order to afford him an opportunity to prepare and file a direct appeal from his conviction. Consequently we will treat this action as a direct appeal of the original conviction rather than an appeal from a denial of collateral relief.

■ Secondly, the rule to show cause which this Court issued pursuant to the appellant's application for habeas corpus relief was specifically limited to the arson record and conviction only. No relief was granted with respect to the appellant's conviction on the malicious wounding charges. Consequently all issues raised by the appellant and by the State with respect to alleged defects in that conviction are not properly before this Court at this time.

The State also raises several preliminary procedural issues which we will address before discussing the substantive claims of the appellant. First the State asserts that the appellant is barred from raising certain of the issues presented in this appeal because they were resolved, after a full hearing, by the circuit court in the appellant's previous habeas corpus proceeding which this Court subsequently refused to review. The State contends that the refusal of this Court to grant the appellant's appeal from the judgment of the circuit court in the prior proceedings has a *res judicata* effect which precludes consideration here of issues raised in both proceedings.

■ We do not think the law supports the State's argument. W.Va.Code § 58–5–9 (1966) provides, in part:

In a case wherein the court shall deem the judgment, decree or order complained of plainly right, and reject it on that ground, no other petition therein shall afterwards be entertained. . . .

This provision has been read to mean that a court's refusal to docket an application for appeal from the judgment of an inferior court is not a final judgment having *res judicata* effect unless the appellate court's rejection of the application for appeal specifically addresses the issues raised by the applicant and finds that the lower court's judgment is plainly right. *Williams v. Irvin*, 101 W.Va. 708, 133 S.E. 390 (1926), *Blumberg v. Snyder*, 90 W.Va. 145, 110 S.E. 544 (1922). The order entered by this Court refusing the appellant's prior appeal from habeas corpus proceedings in the circuit court made no finding as to the correctness of the lower court's judgment. Since the present appeal was filed within the time period provided after the appellant's receipt of a transcript and resentencing, we conclude that his presentation of the same issues in the prior proceeding does not act as a bar upon this action.

■ The State also contends that the appellant is precluded from taking this appeal by virtue of the plea bargain entered with respect to the malicious wounding charges. The State asserts that as part of that plea arrangement the appellant waived forever his right to appeal his conviction on the arson charge. First, we note that the terms of the agreement did not require the appellant to forego his right to appeal, but only to withdraw his pending appeal. There is nothing in the plea bargain which expressly precluded the appellant from seeking other post-conviction relief or from preparing another appeal. However, even if the plea agreement can be read as including a waiver of the right to future appeals, we do not think that such an agreement can bind a defendant who chooses to exercise his right to appeal. Although we find nothing inherently unlawful in a plea bargain conditioned upon the defendant's voluntary and informed waiver of his right to appeal a prior conviction, *see U.S. ex rel. Amuso v. LaVallee*, 291 F.Supp. 383 (E.D. N.Y.1968), *aff'd* 427 F.2d 328 (2nd Cir. 1970); *Staton v. Warden*, 175 Conn. 328, 398 A.2d 1176 (1978); *State v. Crosby*, 338 So.2d 584 (La.1976); *State v. Gibson*, 68 N.J. 499, 348 A.2d 769 (1975); *People v. Williams*, 370 N.Y.S.2d 904, 36 N.Y.2d 829, 331 N.E.2d 684, *cert. denied* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975); *State v. Majors*, 94 Wash.2d 354, 616 P.2d 1237 (1980); ABA Standards, Criminal Appeals 2 (1970); Uniform Rules of Criminal Procedure (U.L.A.) rules 443(a)(4), 444(d), we hesitate to prohibit the defendant from repudi-

ating his bargain in favor of exercising that right. We think that where a defendant enters a plea bargain arrangement whereby he agrees not to appeal a conviction on a previous charge to which he has never admitted guilt, but has been convicted by jury verdict, the defendant should not be deemed to have irrevocably waived his right to appeal. However, if the defendant chooses to disregard the agreement and file a timley appeal, the State should not be held to the bargain and, at its option, may seek resentencing on all other convictions involved in the agreement or reinstitute any charges dismissed pursuant to the plea bargain and proceed to trial thereon. *See Stanton v. Warden, supra; State v. Gibson, supra.*

We turn now to the appellant's remaining substantive issues. The appellant first asserts that during his trial on the arson charge the trial court erroneously allowed the introduction of substantial evidence of other crimes alleged to have been committed by the appellant. The appellant asserts that the collateral crimes of which proof was offered at trial were not related to the crime charged in the indictment.

The prosecution introduced testimony that the appellant's wife had previously been married to Camerson McCallister, son of the owner of the property upon which the arson was committed, and that this prior marriage had produced one child. In late 1973, Camerson McCallister had been given custody of his daughter by the Virginia courts. In February of 1974, the appellant and the child's mother had come to Virginia to visit the child and had abducted her, taking her back to West Virginia with them. Camerson McCallister reported the abduction to the Virginia authorities, obtained arrest warrants and began proceedings to extradite the appellant and the child's mother to Virginia on the abduction charge. A preliminary hearing was set in Virginia for October of 1974.

The State sought to prove that thereafter the appellant had embarked on a vendetta against the McCallister family for the purpose of insuring that he and his wife would have complete custody of the McCallister

child and would not be required to answer the abduction charges in Virginia. To this end the State introduced extensive testimony showing that the appellant, through an intermediary, had hired several persons to go to Virginia on various occasions during August of 1974 to commit assaults against Camerson McCallister for the purpose of intimidating him or killing him. It was from these assaults that the malicious wounding and attempted murder charges against the appellant arose. The testimony of several witnesses indicated that when the first of these attacks upon Camerson McCallister failed to yield the results desired, the appellant, through the same intermediary, procured one of the assailants to commit the arson of the home of Charles McCallister with the stated purpose of luring Camerson McCallister to Boone County so that the appellant could "deal with" him. The State also introduced testimony that the appellant, again acting through the intermediary, solicited others to intimidate or murder his ex-wife, who had instituted child support proceedings against him. The appellant also asserts that the evidence implicates the appellant in being an accessory to obstruction of justice, illegally possessing explosives and defrauding a car rental agency.

We have noted on numerous occasions the well-established exceptions to the rule prohibiting the introduction of evidence that the defendant has committed other crimes.

> The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial.

Syl. pt. 12, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). We think the evidence of collateral crimes clearly comes

within the recognized exceptions enumerated above.

■ The crimes alleged to have been committed against Camerson McCallister were certainly not unrelated to the crime with which the appellant was charged. The evidence that the appellant abducted the McCallister child, for example, established the appellant's motive for hiring someone to commit the arson. The evidence of motive was bolstered by testimony that the arson was conceived after the malicious wounding of Camerson McCallister failed to achieve the purposes of the appellant. In addition, the evidence that the appellant had procured the malicious wounding and the attempted murder of Camerson McCallister and had solicited others to kill his former wife tended to establish that the appellant had devised a systematic strategy for dealing with legal difficulties caused by estranged or extended family members. The arson was part of that strategy. In each case, the appellant chose to employ terroristic tactics to intimidate the victim into abandoning legal action taken against the appellant. In each case the appellant conceived the criminal action to be taken, and procured the services of others to commit the offense. The appellant relied on the same persons to act as the intermediary and the principal actor in each case. The evidence introduced at trial established the manner in which the appellant planned and executed this criminal scheme and explained to the jury how and why the appellant procured the arson of the McCallister home.

■ We think the evidence of these collateral crimes was necessary to explain to the jury how and why the appellant had procured the commission of the arson. It established the appellant's criminal intent and the fact that he was the mastermind of a series of criminal activities directed against members of his extended family who sought to litigate their claims against him. The appellant engaged in a pattern of conduct reminiscent of an ancient mountain feud. Where the accused is charged with being an accessory before the fact to the commission of a felony and the evidence tends to establish that the accused's solicitation of another to commit the principal offense is part of a pattern of criminal conduct devised by the accused and directed toward a particular individual or group of individuals, evidence that the accused procured in the same manner the commission of other crimes against such individual or group of individuals is relevant and admissible to show motive, intent and a common scheme or plan. Consequently, we conclude that the admission at trial of this evidence of collateral crimes was not error.

With respect to the other evidence of collateral crimes cited by the appellant, we find no reversible error. Some of that evidence was related to the State's theory of a common scheme or plan. The introduction of other evidence was not objected to at trial and therefore cannot be considered on appeal. The remainder of that evidence establishes too nebulous a link to criminal activity on the part of the appellant to constitute error.[1] Consequently we affirm the rulings of the trial court on this issue.

The appellant's second contention is that the trial court erred in allowing the prosecution to introduce a tape recording of a telephone conversation that occurred between the appellant and an informant acting in cooperation with the police. The informant placed a telephone call to the appellant from a public telephone booth and agreed to allow the police to record the conversation by means of a device attached to the telephone receiver. In this manner the police were able to record the entire conversation, during which the appellant made several incriminating statements. The appellant contends that the recording of this conversation without his knowledge or consent constituted an invasion of his right of privacy as guaranteed by the prohibition in our state constitution against unreasonable searches and seizures. W.Va. Const. art. 3, § 6.

---

1. Indeed, the Court is inclined to conclude that certain of the appellant's allegations concerning the admission of evidence of other crimes deviate so substantially from the record of the case as to be nonexistent in fact.

There has been much discussion in other jurisdictions during the past decade of the admissibility of evidence obtained by means of electronic surveillance. The discussion was sparked by the decision of the United States Supreme Court in *Katz v. U.S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Prior to *Katz*, the Supreme Court had consistently held that there could be no violation of the Fourth Amendment prohibition against unreasonable searches and seizures absent an unauthorized physical invasion of a constitutionally protected area. Consequently evidence obtained by means of eavesdropping was inadmissible only where the surveillance was accomplished by an unauthorized physical entry onto the defendant's premises or an intrusion upon his person. *See, e.g., Goldman v. U.S.*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942); *Olmstead v. U.S.*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

In *Katz, supra,* however, the Court rejected this view and held that recordings of a defendant's conversation, obtained by government agents by means of an electronic listening device attached to the outside of a public telephone booth, without the knowledge or consent of the defendant or prior judicial authorization, were procured in violation of the Fourth Amendment and, therefore, were inadmissible. The Court noted that the Fourth Amendment protects people, not places, and held that the government's surveillance of the defendant's conversation violated his *justifiable expectation of privacy,* i.e. "that the words he utters into the mouthpiece will not be broadcast to the world." 389 U.S. at 352–353, 88 S.Ct. at 511–512. The Court held that such an invasion constituted a "seizure" within the meaning of the Fourth Amendment, notwithstanding the fact that the electronic listening device did not penetrate the walls of the telephone booth.

In *U.S. v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, *reh. denied*, 402 U.S. 990, 91 S.Ct. 1643, 29 L.Ed.2d 156 (1971), the Supreme Court was called upon to decide whether the Fourth Amendment precluded the introduction of evidence obtained as the result of warrantless electronic monitoring by government agents of con-

versations between the defendant and a participant to the conversation who consented to the surveillance. In *White*, the participant, an informant cooperating with the authorities, had consented to wear a concealed radio transmitter during his conversations with the defendant. Government agents were able to overhear the conversations by using a radio receiver tuned to the frequency of the informant's transmitter. The defendant had no knowledge of and did not consent to the surveillance. At trial, the prosecution was unable to locate the informant, and the government agents who conducted the surveillance were allowed to testify as to the substance of the conversations. The Court of Appeals reversed the defendant's conviction, holding that *Katz* controlled.

The plurality opinion in *White* held that the decision in *Katz* did not apply to surveillance in which the government obtained access to the conversation of the defendant by the consent of another party to the conversation. The plurality noted that previous decisions of the Court, which were left undisturbed by *Katz*, had held that there was no violation of the defendant's Fourth Amendment rights or necessity to obtain a search warrant where the person before whom the defendant made incriminating statements or performed criminal acts was, unknown to the defendant, a government agent who later testified against the defendant at trial, *Hoffa v. U.S.*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. U.S.*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); or where a government agent, unknown to the defendant, carried electronic equipment to record the defendant's conversation for use against him at trial. *Lopez v. U.S.*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

The *White* plurality noted that the rationale in *Hoffa, Lewis* and *Lopez* had been that an individual has no justifiable or constitutionally protected expectation of privacy in incriminating statements he confides to another person under the belief that the other person will not then or later reveal

the contents of the conversation to the police. The plurality concluded that

> [i]f the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

> Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. Very probably, individual defendants neither know nor suspect that their colleagues have gone or will go to the police or are carrying recorders or transmitters. Otherwise, conversation would cease and our problem with these encounters would be nonexistent or far different from those now before us. Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally "justifiable" —what expectations the Fourth Amendment will protect in the absence of a warrant. So far, the law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants in the manner exemplified by *Hoffa* and *Lewis*. If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversa-

tions which are later offered in evidence to prove the State's case. See *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

> Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped agent and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of "reasonableness." 401 U.S. at 751–754, 91 S.Ct. at 1125–1127.

Although the opinion in *White* expressed the view of only a plurality of the Court,[2] it has been widely adopted by the federal courts as controlling on the question of whether Fourth Amendment protection is extended to those whose conversations are subjected, without their knowledge or consent, to electronic surveillance by participants in the conversation acting as police

---

**2.** Justice Black concurred in the judgment on the basis of his view, expressed in his dissenting opinion in *Katz*, that conversations are not subject to search and seizure and therefore are never protected by the Fourth Amendment. Justice Brennan concurred in the result reached by a majority of the Court on the ground that *Katz* was inapplicable to surveillance that occurred before the date of that decision, but agreed with the views of the dissenting justices on the Fourth Amendment issue. Justices Douglas, Harlan and Marshall dissented to the plurality opinion on the ground that permitting surreptitious monitoring of conversations without the restriction of prior judicial approval would have a chilling effect on free discourse. Justice Harlan in particular engaged in a lengthy refutation of the reasoning and authority relied upon by the plurality.

agents.[3] In *U.S. v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), the Supreme Court affirmed its adherence to the plurality view without comment.

The courts in this jurisdiction have not yet resolved the question of whether our state constitution prohibits surreptitious warrantless monitoring of a defendant's conversation by law enforcement officers in cooperation with a consenting informant. State protection of the individual's right of privacy flows from article 3, section 6 of the state constitution which prohibits unreasonable searches and seizures. The purpose of this prohibition "is not the protection of property rights or interests so much as it is the protection of the 'citizen from unwarranted intrusion into his privacy.'" *State v. Peacher*, W.Va. 280 S.E.2d 559, 575 (1981), *quoting Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958). Consequently article 3, section 6 of the West Virginia Constitution protects an individual's reasonable expectation of privacy. *State v. Peacher, supra.* There is little other discussion of the right of privacy in West Virginia jurisprudence.

This Court has, however, implicitly approved the plurality opinion in *White*. In *State v. Andriotto*, 167 W.Va. 501, 280 S.E.2d 131 (1981), an informant, at the request of the police, consented to telephone the defendant in an attempt to elicit incriminating statements from him. The conversation was tape recorded by the police and played for the jury at the defendant's trial. On appeal the defendant alleged that the taped conversation had been erroneously introduced into evidence since the police officers had not informed him of his *Miranda* rights prior to the conversation. This Court rejected the defendant's argument on the ground that the defendant was not being subjected to a custodial interrogation where there was a possibility of coercion. Although no Fourth Amendment issue was raised, the Court went on to say:

> In the instance of Andriotto's telephone conversation there was no possible element of police coercion; the entire conversation emanated from a ruse, the success of which depended upon the appellant's believing that no police were within earshot. This sort of investigating tactic has been repeatedly upheld by the United States Supreme Court. E.g., *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); and *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). 280 S.E.2d at 136.

We are in agreement with this tacit approval of the *White* plurality and we conclude that warrantless electronic recording of a defendant's conversation with the consent of a participant to the conversation who, unknown to the defendant, is acting in concert with the police does not violate the prohibition against unreasonable searches and seizures contained in article 3, section 6 of our state constitution. This conclusion places us within the vast majority of jurisdictions which have adopted the plurality opinion of *White*. See, e.g., *Kerr v. State*, 256 Ark. 738, 512 S.W.2d 13 (1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); *State v. Stanley*, 123 Ariz. 95, 597 P.2d 998 (1979); *State v. Wilder*, 18 Ariz.App. 410, 502 P.2d 1087 (1972); *People v. Murphy*, 8 Cal.3d 349, 105 Cal.Rptr. 138, 503 P.2d 594 (1972), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *People v. Morton*, 189 Colo. 198, 539 P.2d 1255 (1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46

---

**3.** See, e.g., *U.S. v. Salisbury*, 662 F.2d 738 (11th Cir. 1981); *U.S. v. Gorel*, 622 F.2d 100 (5th Cir. 1979); *U.S. v. Horton*, 601 F.2d 319 (7th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *U.S. v. Gladney*, 563 F.2d 491 (1st Cir. 1977); *U.S. v. McMillan*, 508 F.2d 101 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); *U.S. v. Santillo*, 507 F.2d 629 (3rd Cir.), *cert. denied*, 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975); *U.S. v. Lippman*, 492 F.2d 314 (6th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975); *U.S. v. Bonanno*, 487 F.2d 654 (2d Cir. 1973); *Holmes v. Burr*, 486 F.2d 55 (9th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973); *U.S. v. Dowdy*, 479 F.2d 213 (4th Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973); *U.S. v. Quintana*, 457 F.2d 874 (10th Cir.), *cert. denied*, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972).

L.Ed.2d 642 (1976); *State v. Delmonaco,* 165 Conn. 163, 328 A.2d 672 (1973); *People v. Richardson,* 60 Ill.2d 189, 328 N.E.2d 260, *app. dismissed,* 423 U.S. 805, 96 S.Ct. 13, 46 L.Ed.2d 25 (1975); *State v. Jordan,* 220 Kan. 110, 551 P.2d 773 (1976); *Carrier v. Commonwealth,* 607 S.W.2d 115 (Ky. App.1980); *State v. Petta,* 359 So.2d 143 (La.1978); *Avery v. State,* 15 Md.App. 520, 292 A.2d 728, *app. dismissed,* 410 U.S. 977, 93 S.Ct. 1499, 36 L.Ed.2d 173 (1972); *Commonwealth v. Thorpe,* 424 N.E.2d 250 (Mass.1981); *State v. Bellfield,* 275 N.W.2d 577 (Minn.1978); *Everett v. State,* 248 So.2d 439 (Miss.1971); *State v. Anepete,* 145 N.J.Super. 22, 366 A.2d 996 (1976); *State v. Detler,* 298 N.C. 604, 260 S.E.2d 567 (1979); *State v. Geraldo,* 68 Ohio St.2d 120, 429 N.E.2d 141 (1981); *Commonwealth v. Donnelly,* 233 Pa.Super. 396, 336

A.2d 632 (1975), *cert. denied,* 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976); *Thrush v. State,* 515 S.W.2d 122 (Tex.Crim. App.1974); *Cogdill v. Commonwealth,* 219 Va. 272, 247 S.E.2d 392 (1978).[4]

Thus, for the reasons cited herein, we conclude that the Circuit Court of Boone County did not err in admitting the evidence of collateral crimes and the tape recorded telephone conversation. Accordingly the appellant's conviction is affirmed.

Affirmed.

**4.** Some courts have interpreted the statutes of their jurisdictions to afford greater protection of the right of privacy than that available under the Fourth Amendment. *State v. Ayres,* 118 N.H. 90, 383 A.2d 87 (1978); *Arnold v. State,* 94 N.M. 381, 610 P.2d 1210 (1980); *State v. Williams,* 94 Wash.2d 531, 617 P.2d 1012 (1980); *State v. Smith,* 72 Wis.2d 711, 242 N.W.2d 184 (1976); *State ex rel. Arnold v. County Court of Rock County,* 51 Wis.2d 434, 187 N.W.2d 354 (1971).

Others have interpreted express provisions of their state constitutions guaranteeing the right of privacy as affording more protection than the Fourth Amendment. *State v. Glass,* 583 P.2d 872 (Alaska 1978); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978). However, at least one other state has held that the express reservation of a right to privacy in the state constitution does not obviate the force of the

plurality view of *White.* In 1974, the California constitution was amended to secure the individual's right of privacy. The California Court of Appeal thereafter reaffirmed its concurrence in the *White* plurality view, holding that "one engaging in an illegal activity has no reasonable expectation of privacy when conversing with another person and has no right to expect that his statements will not be repeated by that person or monitored by some mechanical means." *People v. Salas,* 51 Cal.App.3d 151, 157, 123 Cal.Rptr. 903, 907 (1975).

Our research reveals only one jurisdiction that has rejected the approach of the plurality of *White* in favor of broader privacy protection without relying on a state statute or constitutional provision. *See People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511, *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975).